| UNITED STATES DISTRICT COURT | | C/M |
| EASTERN DISTRICT OF NEW YORK | | |

------------------------------------------------------- X
SECURITIES AND EXCHANGE             :
COMMISSION,                         :
                                    :
              Plaintiff,    :  **MEMORANDUM DECISION AND**
                                    :  **ORDER**
     -against-                      :
                                    :  18-cv-1498 (BMC)
SPARK TRADING GROUP, LLC and NIKET  :
SHAH,                               :
                                    :
              Defendants.   :
------------------------------------------------------- X

**COGAN**, District Judge.

      The Securities and Exchange Commission filed a motion for summary judgment against defendants Niket Shah and Spark Trading Group, LLC, neither of which have filed any opposition to the motion. The SEC's motion for summary judgment is granted for the reasons stated below.

## BACKGROUND

      The following facts are taken from the SEC's Local Rule 56.1 statement and are supported by affidavits and other evidence. Shah is the founder of Spark Trading, an investment fund that is not registered with the SEC. Before founding Spark Trading, Shah opened an account on a binary options exchange and sustained over $29,000 in net losses. But he told an investor that he had a fund that was registered with the SEC and already earned significant returns.

      Shah offered and sold shares of Spark Trading to investors in what he called "Spark Fund I." Shah offered 240 shares of Spark Fund I for $1,000 per share, for a total offering of

$240,000. Shah claimed that the fund would pay out 75% of the trading profits per share, with the remaining 25% of the profit going to the fund.

In offering materials, Shah told investors "[t]here are absolutely NO prerequisites to purchasing equity in our business" and "[s]ince the $240,000 of equity is backed by our start-up capital, there will be absolutely NO loss incurred by you, the investor." Defendants directed investors to wire their investments into Shah's personal bank account.

Although Shah continued to suffer extensive trading losses – he lost over $35,000 during the first payout period – he told investors that "86% of all trades we made ended up being profitable" and that Spark Fund I had returned payouts to investors of $260.03 per share, which equated to a 26% return, in less than two months. Shah also provided falsified records that purported to show "transaction detail on every trade" but these transactions did not occur.

When one investor asked how she could know Spark Trading was not some "Madoff-ish type Ponzi scheme," Shah sent her purported screenshots from his bank account showing $200,000 of $250,000 in venture capital funds being deposited into his account. But these bank statements were fake. Shah had not acquired any start-up capital, did not have a $250,000 deposit, and did not make any $200,000 deposit into his binary options trading account, which had a balance of $10.25. Nonetheless, the investor and her retired mother invested with Shah.

Shah then began offering interests in a second Spark Trading fund, Spark Fund II. In the offering brochure for Spark Fund II, defendants claimed Spark Fund I was profitable for each of the first five months and had entered into a deal for additional start-up capital. Shah also claimed that Spark Trading raised $240,000 in funding from Spark Fund I through 63 investors, and that with the additional venture capital funding, the investors' "entire investment is guaranteed." Shah also told investors that he was trading approximately $50,000 in traditional options.

2

Again, Shah's representations were false. Spark Fund I was not profitable. Shah had actually deposited and traded only $1,200 in traditional options. Neither Shah nor Spark Trading had acquired any amount of start-up capital, nor did they have any source of funds that could have backed the investors' funds.

At least 15 investors purchased securities from defendants, who sold at least $370,944.04 in securities and deposited the same amount into their accounts. Defendants returned at least $71,714.36 to investors, but most of the investment funds were transferred to Shah's personal accounts. Shah spent some of the funds on bars, restaurants and liquor store purchases.

Shah failed to return the remaining funds to investors and made a number of false claims to explain the lack of payment. Shah then informed investors that Spark Trading would shut down. The SEC brought this action and moved for, among other things, a temporary restraining order. Defendants did not oppose the SEC's motion, which was granted. The SEC later moved for summary judgment, which defendants did not oppose.

## DISCUSSION

### I. Liability

"Summary judgment is appropriate when the pleadings, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law." Figueroa v. City of New York, No. 06-cv-6277, 2015 WL 1298502, at *3 (E.D.N.Y. Mar. 23, 2015). To prevail on its claims under Section 10(b) and Rule 10b-5, the SEC must show that each defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent

device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999).[1]

To be material, a statement or omission must significantly alter the "total mix" of available information. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." SEC v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) (internal quotation marks omitted).

An "investment contract," which the Securities Act and Exchange Act include in the definition of a "security," is an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others. SEC v. W.J. Howey, 328 U.S. 293 (1946). The "in connection with" requirement is met if the fraud and the sale of securities coincide. SEC v. Zandford, 535 U.S. 813, 822 (2002).[2]

Defendants falsely claimed that Spark Trading was registered with the SEC; that their investments were profitable; that investors' funds in Spark Fund I were guaranteed; and that defendants received $250,000 in start-up capital, including $200,000 that Shah deposited into a binary options trading account. These false statements significantly altered the total mix of available information and were made with scienter.

Further, the interests in Spark Funds I and II fall squarely within the definition of an investment contract. Investments were pooled into a common enterprise in both funds, and

---

[1] For its Section 17(a) claims, "the SEC must set forth 'essentially the same elements' as are required under Section 10(b) . . . 'though no showing of scienter is required for the SEC to obtain an injunction under Section 17(a)(2) or (a)(3).'" SEC v. Ehrenkrantz King Nussbaum, Inc., 16 No. 05-cv-4643, 2012 WL 893917, at *11 (E.D.N.Y. Mar. 15, 2012) (quoting Monarch Funding, 192 F.3d at 308).

[2] The relevant language of Section 17(a) of the Securities Act, which uses the term "in" instead of "in connection with" the sales of securities, is not narrower than the relevant language of Section 10(b) of the Exchange Act. United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979).

Shah's alleged success in investment gave investors a reasonable basis for expecting profits. Defendants' misrepresentations not only coincide with the purchase and sale of securities, but the misrepresentations were made on the same communications through which defendants solicited and obtained investments.

**II. Remedies**

A court may grant a permanent injunction in actions brought by the SEC upon proper showing, which requires that defendants violated the securities laws at issue and a reasonable likelihood that violations will occur in the future. S.E.C. v. Lipkin, No. CV-99-7357, 2006 WL 435035 (E.D.N.Y. Jan. 6, 2006).

Because defendants have been found liable for violating securities laws and because defendants' position in the financial industry places them in a position to commit future violations, the prior preliminary injunction restraining defendants from violating Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act shall be converted into a permanent injunction.

Courts may also order disgorgement to "depriv[e] violators of the fruits of their illegal conduct." S.E.C. v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014). In doing so, courts may award prejudgment interest that "reasonably approximat[es] the cost of borrowing [defendants' illicit] gain from the government." Id. at 308. Defendants are jointly and severally liable for disgorging $299,229.68[3] plus prejudgment interest of $24,742.83 as of December 21, 2018.

---

[3] This sum is the result of subtracting the amount defendants returned to investors from the amount investors provided them. The SEC's request for $299,279.68 appears to be the result of a miscalculation.

In addition, the Securities Act and the Exchange Act provide for penalties that shall not exceed the greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or a specified amount per violation. 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 77t(d) (using similar language). When determining whether to impose civil penalties and the amount of any civil penalties, courts consider: the egregiousness of defendants' conduct; the degree of defendants' scienter; whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; whether defendants' conduct was isolated or recurrent; and whether the penalty should be reduced due to defendants' demonstrated current and future financial condition. S.E.C. v. Milligan, No. 09–2782–cv, 2011 WL 3629963, at *2 (2d Cir. 2011).

Here, as noted above, defendants engaged in a complex scheme – rather than isolated conduct – that imposed at least $299,229.68 in losses on investors and did so with a high degree of scienter. Defendants have not demonstrated any current or future financial conditions that would reduce a penalty for their egregious conduct.

A penalty of $370,944.04 – the gross pecuniary gain from defendants' scheme – is therefore appropriate. Shah directed investors to wire their investments into his personal account, rather than into a Spark Trading account. Because Shah received the pecuniary gain, he shall be liable for the full penalty of $370,944.04.

## **CONCLUSION**

The SEC's [35] motion for summary judgment is granted. The defendants are jointly and severally liable for disgorging $299,229.68 plus prejudgment interest. Shah is liable for $370,944.04 in civil penalties. The preliminary injunction restraining defendants from violating Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act shall be

converted into a permanent injunction.  A Final Judgment and Permanent Injunction will enter accordingly.

**SO ORDERED.**

                                                                                         _____
                                                                                                         U.S.D.J.

Dated:  Brooklyn, New York
         December 20, 2018